28633, 28658. METROPOLITAN LIFE INSURANCE COMPANY *v.* DANIEL; and *vice versa.*

DECIDED FEBRUARY 27, 1941. REHEARING DENIED MARCH 26, 1941.

*William L. Clay,* for plaintiff in error.
*Connerat & Hunter, Edwin J. Feiler,* contra.

FELTON, J. ■ This is the second appearance of this case in this court. *Metropolitan Life Insurance Co.* v. *Daniel,* 61 *Ga. App.* 90 (5 S. E. 2d, 681). Under the terms of the policy sued on, the liability of the company attached if the insured became "totally and permanently disabled as a result of bodily injury or disease, so as to be prevented thereby from engaging in any occupation and performing any work for compensation or profit." This provision means the same thing as the provisions in the cases of *Cato* v. *Ætna Life Insurance Co.,* 164 *Ga.* 392 (138 S. E. 787) and *Prudential Life Insurance Co.* v. *South,* 179 *Ga.* 653 (177 S. E. 499, 98 A. L. R. 781), as they are construed by the Supreme Court. No reason appears why a different construction should

be adopted simply because the policy in the instant case is primarily a life-insurance policy and certificate with a provision that the disability payments might be elected in lieu of payment of the certificate upon the death of the insured.

The jury was authorized to find that Thomas Daniel, the insured, was permanently disabled under the terms of the policy. He testified substantially as follows: "I am forty-five years old. I started working for the Southeastern Compress Company in June, 1929. I got hurt while working at the compress. The kind of work I was doing when I got hurt was sewing bagging together. When cotton comes to the compress, long bagging is on each side; when it gets in the press we have a needle and a piece of twine to fold the bagging and stitch it up and sew it so it will not come apart, sewing with the right hand. With the left hand I hold it together to help pull the needle through; it requires two hands. My left hand was cut off two inches above the wrist by Dr. Holton in March, 1937, as a result of my injury. Before I lost my hand I did other work besides sewing. I did general work, trucking, pulling cotton out of the pile, helped loading cars. By trucking I mean hand trucks—two hands. I have no education to talk about. I can read very little. I can not write at all. To the time I lost my left hand I never did any kind of work besides manual labor. Since the time I got hurt I have not been able to do manual labor. It takes a man with two hands to load and handle things. Since I got hurt I have not been able to pursue the customary duties of my employment. I could not sew heads in the compress with one hand. In trucking cotton it takes a man with two hands. You have to have two hands to balance the truck. I could not pull cotton down off the pile with one hand. It was too dangerous. Since my injury I have not been able to do any substantial part of my former work at all. Before I lost my hand I earned on an average from $12 to $14 a week. After I got hurt I went back to the compress company to see about getting some work to do. I would see Mr. Walker or Mr. Ward. They said when I was able to come back they would give me something. They let me go back. They said they would give me something to do, to help me along. Since I was hurt I have been dragging bands from the press and taking them to the machine to be straightened out. I can do that work with one hand. Besides dragging

bands I cut some grass in between, but not very much. My average wages after my injury would go around $4.50 or $5 a week, but I did not make that every week. There is no other work at the compress that I could do with one hand, besides those I have mentioned. I tried to get work elsewhere. I tried two or three times, transfer trucks, unloading boxes. They did not hire me. I could not do the work. I tried W. P. A. The lady said she would not consider my case. I was classed as unemployable. I had no trade or occupation or work that I could do, or any training that I could do without two hands. Before I was hurt I trucked cotton and got twenty-five cents an hour for trucking. Some of the time I sewed bales for which I got twenty-seven and a half cents per hour. The amount of money I made depended on the hours I made. The hours I made depended on the bales pressed. Since my injury I have received twenty-five cents an hour. After the wage-and-hour increase I have received forty-five cents an hour for overtime. I know Joe Mack. He worked at the compress company. He works pulling cotton on trucks. He cuts grass. He pulls the cotton down. That was not the same kind of work I was doing before I lost my hand. Sometimes I would pull cotton on trucks, sometimes tearing down the pile. After I got hurt I could not do that. Joe Mack has been doing that. Joe Mack has only one hand."

T. A. Ward, superintendent of the compress company, testified, for the defendant, to the same facts to which Daniel testified with reference to the kind of labor Daniel performed before and after his injury, the rate of pay, etc. He testified further: "The government changed the rate per hour from twenty-five cents to thirty cents. Daniel did some overtime, not a great deal. I have two other one-armed men at the plant. Joe Mack, one of them, pulled cotton down with one hand. He catches hold on the side and twists around to get buckles right, so they can take the bands off, before going to the press. He seems to be a man in practically the same physical condition as Tom Daniel. We have one-handed men at compresses at Savannah, at Dothan, Alabama, and Atlanta, Georgia. One of the men at Dothan trucked cotton, and other work. He did not have an artificial arm. The man in Atlanta did various jobs, like pulling down cotton; everything we wanted him to do. They got the same rate of pay that Daniel got for the

same class of work. The number of laborers I have out there is dependent entirely on the amount of cotton that comes in at the press. The amount coming in affects the hours that laborers work. It affects the amount of pay he gets a week, but not the rate. Daniel received about two and a half cents less per hour's work after his injury than before. The compress company has a very liberal policy towards its employees who have been injured on the job. I have instructions to never discriminate in any way against an employee who has suffered disability while in our employment, as long as he can do his regular work. I have no such instructions irrespective of whether he can do his regular work or not. That is left with me. I also have instructions that whenever work is available our first consideration must be given to such employees, and I carried out that charitable policy towards Daniel in the last two years. Daniel was physically able, and does the work we employ him to do. If he is not physically able, I would probably not employ him. I regard Daniel as physically able to do the work. Since he came back his work has always been satisfactory. Our policy does not mean that when an injured employee is not physically able to work we employ him. I recognize that even if disabled our company still has a charitable view, that we want him employed."

Certain statistics were introduced for the purpose of showing that the reduction in the number of hours Daniel worked and in his average weekly wage was due to a decrease in the number of bales handled by the compress.

The evidence authorized the finding that Daniel, a common manual laborer, was incapacitated by his injuries from performing substantially all of his former work, and from performing substantially all the manual labor involved in any work to which, in his condition and under his circumstances, he might seek to turn for a livelihood. It was inferable from the evidence that Daniel did not and could not perform substantially all of his previous duties, and that his employment by the compress was largely if not entirely due to charity. It is true that the officer of the compress company stated that he employed Daniel because he could do the work given him. Yet he referred to the attitude toward Daniel as a charitable one. The jury was authorized to conclude that if Daniel was employed because he could perform the work

as well as a normal laborer there would have been no occasion for charity. The fact that Daniel was classed as unemployable by the W. P. A. is undisputed. This fact is also relevant on the question of disability and the reasons actuating the employment by the compress. Such evidence as charitable motive for employment was held admissible on the question of disability, in Texas & Pacific *v.* Volk, 151 U. S. 73 (14 Sup. Ct. 239, 38 L. ed. 78). The amount received by Daniel, even if equal to receipts before his injury, would not bar his recovery, if they in fact were wholly or largely charity, any more than charity or benevolence from sources other than his employer would bar it.

■ The notice or proof of claim was sufficient. In his claim the insured stated that he was permanently and totally disabled, due to the loss of his hand. So did a letter from his attorney to the company. The fact that the attending physician in his statement gave it as his opinion that the disability was temporarily total would not alter the sufficiency of the proof.

■ The following charge was not error: "I charge you, with reference to a verdict, in the event you find for the plaintiff, in the event you find for him at all, it is given to you as information and not to indicate which way you are to find. As I say, in the event you find for the plaintiff, you can either write it out in the form 'We, the jury, find for the plaintiff in the sum of $663.52, with interest at the rate of seven per cent. per annum,' or you can write it out 'We, the jury, find for the plaintiff for thirteen months disability at the rate of $51.04, from March 27th, 1937, and interest on each installment at the rate of seven per cent. per annum.' Gentlemen of the jury, this suit is for $663.52, representing thirteen monthly installments at the rate I have already given you, so much per month, with interest, or a total of $663.52. The court has already given you gentlemen in full, at the outset, the form of the verdict if you find for the plaintiff. In the event I did not give it, in the event you find for the defendant, the form would be 'We, the jury, find for the defendant against the plaintiff.' That is all, gentlemen of the jury." The evidence authorized only two verdicts, one for the plaintiff for the full amount sued for or one for the defendant.

■ There is no merit in any of the other grounds of the motion for new trial. The court gave the jury the law on the question

of total and permanent disability substantially as enunciated in the *South* case, supra, and it does not seem to be misleading or confusing as a whole. Some of the requests to charge were predicated on the theory that the *Cato* and *South* cases and others were wrong, and were offered in contemplation of a request that the cases mentioned be reviewed on certification. Others were predicated upon the theory that Daniel was not entitled to recover if he made approximately as much per hour after his injury. These did not take into account the fact that the jury could attribute the employment after the injury to charity. The charge as given covered the issues fully.

■ The attorney for the plaintiff in error has presented a strong and elaborate brief in support of his request that we certify the question of what is meant by permanent and total disability under the terms of the policy. In view of the recentness of the Supreme Court decisions in the *Cato* and *South* cases, and the very elaborate discussions in them, we do not feel justified in granting the request. The court did not err in overruling the motion for a new trial.

*Judgment affirmed on the main bill of exceptions; cross-bill dismissed. Stephens, P. J., and Sutton, J., concur.*